SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**Vincent Hager v. M&K Construction (A-64-19) (084045)**

**Argued December 1, 2020 -- Decided April 13, 2021**

**SOLOMON, J., writing for the Court.**

In this appeal, the Court considers the challenges brought by defendant M&K Construction (M&K) with regard to a workers' compensation court's order (the Order) that M&K reimburse plaintiff Vincent Hager for the ongoing costs of the medical marijuana he was prescribed after sustaining a work-related injury while employed by M&K. Specifically, M&K contends that New Jersey's Jake Honig Compassionate Use Medical Cannabis Act (Compassionate Use Act or the Act) is preempted as applied to the Order by the federal Controlled Substances Act (CSA). Compliance with the Order, M&K claims, would subject it to potential federal criminal liability for aiding-and-abetting or conspiracy. M&K also asserts that medical marijuana is not reimbursable as reasonable or necessary treatment under the New Jersey Workers' Compensation Act (WCA). Finally, M&K argues that it fits within an exception to the Compassionate Use Act and is therefore not required to reimburse Hager for his marijuana costs.

Hager suffered a back injury while working for M&K in 2001. He underwent surgery, but his pain persisted and he continued to take prescribed opioid medication. In April 2016, Hager began treating with a hospice and palliative care physician, who enrolled Hager in New Jersey's medical marijuana program both as an alternative pain treatment and as a means to wean him off of opioids. Hager's marijuana prescription cost him more than six hundred dollars each month.

At a worker's compensation trial, Hager testified personally, and both he and M&K presented testimony by medical experts. Identifying medical marijuana and opioids as the only two choices for pain management, the court concluded that "marijuana is the clearly indicated option" and ordered M&K to reimburse the costs of Hager's medical marijuana and reasonably related expenses. The compensation court rejected M&K's claim that, like a private health insurer or government medical benefit program, M&K could not be required to reimburse the cost of medical marijuana.

The Appellate Division affirmed, 462 N.J. Super. 146, 153 (App. Div. 2020), and the Court granted M&K's petition for certification, 241 N.J. 484 (2020).

1

**HELD:** M&K does not fit within the Compassionate Use Act's limited reimbursement exception, and Hager presented sufficient credible evidence to the compensation court to establish that the prescribed medical marijuana represents, as to him, reasonable and necessary treatment under the WCA. Finally, the Court interprets Congress's appropriations actions of recent years as suspending application of the CSA to conduct that complies with the Compassionate Use Act. As applied to the Order, the Court thus finds that the Act is not preempted and that M&K does not face a credible threat of federal criminal aiding-and-abetting or conspiracy liability. M&K is ordered to reimburse costs for, and reasonably related to, Hager's prescribed medical marijuana.

1. The Court first considers whether M&K is exempt from reimbursing Hager for his medical marijuana under N.J.S.A. 34:6I-14. The Compassionate Use Act, N.J.S.A. 24:6I-1 to -30, was enacted by the New Jersey Legislature in 2010 in recognition of the beneficial uses of marijuana and to protect authorized individuals from criminal and civil penalties. Of relevance to the present matter, the Act provides that reimbursement for medical marijuana costs is not required of "a government medical assistance program or private health insurer." N.J.S.A. 24:6I-14 (emphasis added). (pp. 13-15)

2. Based that plain language, the Court agrees with the compensation court's determination, affirmed by the Appellate Division, that N.J.S.A. 24:6I-14 does not apply to M&K. The Court reads "or" as limiting the applicability of the exception to only the two kinds of entities named, in accordance with general principles of statutory interpretation and the Act's recognition of the potential health benefits of medical marijuana. See N.J.S.A. 24:6I-2(e). That reading, further, is supported by the definition of "Health insurance" in the Life and Health Insurance Code, which unambiguously states "[h]ealth insurance does not include workmen's compensation coverages." N.J.S.A. 17B:17-4. In the Court's view, if the Legislature sought to depart from that general definition and treat workers' compensation and private health coverage in the same manner under the Compassionate Use Act, it could have expressly included workers' compensation insurance in its exhaustive list or broadened the exception more generally, as other states have explicitly done. The Court concludes that the Legislature clearly did not intend for workers' compensation insurers to be treated as private health insurers or government medical assistance programs under the Compassionate Use Act. M&K is therefore not exempt from its reimbursement obligation. (pp. 15-18)

3. The Court next considers M&K's argument that medical marijuana is not a "reasonable and necessary treatment" for which the WCA provides coverage. The Court reviews the legislative history of the WCA, which requires employers to provide "such medical, surgical and other treatment . . . as shall be necessary to cure and relieve the worker of the effects of the injury" incurred in the course of employment, and specifies that all fees for the "treatment shall be reasonable." N.J.S.A. 34:15-15. Under interpretive case law, it must be shown that the chosen treatment is "reasonable" and "necessary" to cure or relieve the injury of the worker. A mere showing that the injured

2

worker would benefit from the treatment is not enough.  Nevertheless, palliative care may be properly authorized under the WCA, and workers who are permanently disabled and beyond hope of being cured are still entitled to continued treatment and services. Competent medical testimony that a particular treatment or service will reduce symptoms or restore function is sufficient to satisfy the requirement of reasonable and necessary care.  (pp. 18-20)

4.  Like the compensation court and the Appellate Division, the Court concludes that medical marijuana may be found, subject to competent medical testimony, to constitute reasonable and necessary care under New Jersey's workers' compensation scheme. The Court reviews Squeo v. Comfort Control Corp., 99 N.J. 588 (1985), which instructs its analysis here.  In this appeal, the doctors who testified on behalf of Hager convinced the compensation court that Hager remains in chronic pain and that ongoing treatment is necessary.  Identifying medical marijuana and opioids as the two treatment options available, the court concluded, after thoughtful consideration of the medical testimony discussing the risks and benefits of each, that marijuana was "the clearly indicated option."  Reimbursement payments for the cost of Hager's prescribed medical marijuana -- the treatment ordered here -- may not yet be common, but they are certainly less unique than the construction of a self-contained apartment, which the Court found appropriate in Squeo.  Indeed, marijuana's ability to relieve pain has been expressly recognized by the Legislature in the Compassionate Use Act.  N.J.S.A. 24:6I-2(a), -3.  Thus, competent evidence relating to medical marijuana's ability to restore some of a worker's function or, as in Hager's case, relieve symptoms such as chronic pain and discomfort, is sufficient to find such a course of treatment appropriate.  As in Squeo, the Court recognizes the potential harm that may be inflicted on Hager by the alternative available treatment; here, that would mean opioid treatment and a "likely path . . . [of] worsening addiction and ultimately death."  Sufficient credible evidence in the compensation court record -- medical records and hearing testimony -- supported the Order.  (pp. 21-23)

5.  The Court next considers whether the federal CSA extinguishes M&K's obligations under state law.  New Jersey law diverges from federal law not just as to medical marijuana but as to its recreational use as well, given New Jersey's recent legalization of recreational marijuana.  Notwithstanding New Jersey's legalization of the medical and recreational use of marijuana, the CSA must be considered.  The principles of federal preemption are rooted in the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, which unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail.  Because the CSA explicitly leaves room for state law to operate, see 21 U.S.C. § 903, the Court focuses on conflict preemption, which occurs in two scenarios:  where it is impossible for a private party to comply with both state and federal requirements, and when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  The Court explains that preemption is not to be lightly presumed and that deciphering congressional intent is central to preemption analysis.  (pp. 24-29)

3

6. Enacted by Congress in 1970, the CSA replaced a network of drug laws with a comprehensive regime, separating controlled substances into five schedules based on their accepted medical uses, risk of abuse, and physical and psychological effects. Marijuana was placed in the strictest schedule -- Schedule I -- at the time of the CSA's enactment. Substances on Schedule I must be found to have a high potential for abuse, no currently accepted use for medical treatment, and a lack of accepted safety measures for use under medical supervision. 21 U.S.C. § 812(b)(1). Marijuana remains a Schedule I drug today, despite repeated efforts to petition for its rescheduling. Except as otherwise authorized, the CSA makes it unlawful to knowingly or intentionally "possess with intent to manufacture, distribute, or dispense, a controlled substance." Id. § 841(a)(1). The CSA also makes unlawful, subject to exceptions, the knowing or intentional possession of a controlled substance "unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice." Id. § 844(a). (pp. 30-31)

7. The "valid prescription" language contained in § 844(a) cannot, however, apply to marijuana because the CSA prevents marijuana from being validly prescribed. On the enforcement front, guidance from senior personnel in the Department of Justice (DOJ) to the offices of the United States Attorneys issued over the past decade or so has, at times, deprioritized -- but not prohibited -- federal prosecution of marijuana activities that are legal under state law. More importantly, Congress has also deprioritized prosecution for possession of medical marijuana while leaving the CSA otherwise unchanged. In the relevant rider to the most recent federal Appropriations Act, Congress prohibited the DOJ from using allocated funds to prevent states, including New Jersey, from implementing their medical marijuana laws. Similar language has been included in appropriations riders dating back to the 2015 federal budget. (pp. 32-35)

8. The tension between Congress's appropriations riders and the CSA's classification and criminalization of marijuana is manifest. Mindful that preemption analysis turns on legislative intent, the Court reviews case law examining whether and under what circumstances appropriations acts -- reflecting a shift in intent with respect to earlier legislation -- are deemed to impliedly suspend or supplant the earlier law. "[A]lthough repeals by implication are especially disfavored in the appropriations context, Congress nonetheless may amend substantive law in an appropriations statute, as long as it does so clearly." Robertson v. Seattle Audubon Soc'y, 503 U.S. 429, 440 (1992). The Court observes that the federal decisions it has reviewed mirror the Court's own reading of appropriations acts as signifiers of legislative intent to suspend earlier statutory enactments in City of Camden v. Byrne, 82 N.J. 133 (1980). The Court noted in Byrne, as did the Ninth Circuit in United States v. McIntosh, 833 F.3d 1163 (9th Cir. 2016), the limited applicability of appropriations laws -- confined to a particular fiscal year -- and concluded that their effect on the previously enacted statutes was best expressed as implied suspension as opposed to implied repeal. (pp. 36-41)

4

9.  Here, the CSA expressly contemplates a role for state law absent a "positive conflict" with the CSA.  See 21 U.S.C. § 903; see also Gonzales v. Oregon, 546 U.S. 243, 251 (2006).  The Compassionate Use Act seeks to operate in the space afforded to it by federal law and federal priorities.  Congress has, for seven consecutive fiscal years, prohibited the DOJ from using funds to interfere with state medical marijuana laws through appropriations riders.  Congress is empowered to amend the CSA via an appropriations action provided "it does so clearly," see Robertson, 503 U.S. at 440, and the most recent appropriations rider, in the Court's view, "clearly is intended as a substitute" to the CSA as applied to the Compassionate Use Act, see Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs, 619 F.3d 1289, 1299 (11th Cir. 2010).  Therefore, the Court finds that Congress has spoken through the most recent appropriations rider and gives it the final say.  (pp. 41-44)

10.  The Court concludes that the CSA, as applied to the Compassionate Use Act and the Order at issue, is effectively suspended by the most recent appropriations rider for at least the duration of the federal fiscal year.  Because DOJ enforcement of the CSA may not, by congressional action, interfere with activities compliant with the Compassionate Use Act, the Court finds that there is no "positive conflict" and that the CSA and the Act may coexist as applied to the Order.  See 21 U.S.C. § 903.  Qualified patients may continue to possess and use medical marijuana, and related compensation orders may be entered while federal authorities continue to enforce the CSA to the extent Congress permits.  The federal and state acts can thus consistently stand together, and it is possible for M&K to comply with both.  The Compassionate Use Act does not currently present an obstacle to Congress's objectives as articulated in the recent appropriations riders, and so the CSA does not preempt the Compassionate Use Act as applied to the Order.  The Court underscores the "temporal nature" of the issue and its dependence on the future acts of Congress.  See McIntosh, 833 F.3d at 1179.  (pp. 44-47)

11.  The Court is unpersuaded by M&K's contention that its compliance with the Order would subject it to aiding-and-abetting and conspiracy liability under federal law on the theory that it would be assisting in Hager's possession of marijuana, contrary to the CSA.  M&K's payments would not satisfy the specific intent requirement for aiding-and-abetting liability when the facts so clearly indicate that it will be reimbursing Hager against its will and at the behest of the Court.  Likewise, to the extent that the Order requiring reimbursement payments creates a conspiracy between Hager and M&K, M&K's membership cannot be said to be intentional.  Rather, its participation is being compelled by the courts.  (pp. 47-51)

**AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON'S opinion.**

5

Vincent Hager,

Petitioner-Respondent,

v.

M&K Construction,

Respondent-Appellant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
462 N.J. Super. 146 (App. Div. 2020).

| Argued | Decided |
|--------|---------|
| December 1, 2020 | April 13, 2021 |

Matthew Gitterman argued the cause for appellant
(Biancamano & DiStefano, attorneys; James E.
Santomauro, on the brief).

Victor B. Matthews argued the cause for respondent
(Victor B. Matthews, on the brief).

Alan Silber argued the cause for amici curiae National
Organization for the Reform of Marijuana Laws, Garden
State-NORML, Coalition for Medical Marijuana-NJ and
Doctors for Cannabis Regulation (Pashman Stein Walder
Hayden, attorneys; Alan Silber, of counsel and on the
brief, and Dillon J. McGuire, on the brief).

Elizabeth R. Leong submitted a brief on behalf of amicus
curiae of American Property Casualty Insurance

1

Association (Robinson & Cole, attorneys; Elizabeth R. Leong, on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

Vincent Hager injured his back in a work-related accident in 2001 while employed by M&K Construction (M&K). For years thereafter, Hager received treatment for chronic pain with opioid medication and surgical procedures to no avail. In 2016, he enrolled in New Jersey's medical marijuana program both as a means of pain management and to overcome an opioid addiction. Thereafter, a workers' compensation court found that Hager "exhibit[ed] Permanent Partial Total disability" and ordered M&K to reimburse him for the ongoing costs of his prescription marijuana (the Order). The Appellate Division affirmed.

Before us, M&K contends that New Jersey's Jake Honig Compassionate Use Medical Cannabis Act (Compassionate Use Act or the Act) is preempted as applied to the Order by the federal Controlled Substances Act (CSA). Compliance with the Order, M&K claims, would subject it to potential federal criminal liability for aiding-and-abetting or conspiracy. M&K also asserts that medical marijuana is not reimbursable as reasonable or necessary treatment under the New Jersey Workers' Compensation Act (WCA). Finally, M&K

2

argues that it fits within an exception to the Compassionate Use Act and is therefore not required to reimburse Hager for his marijuana costs.

We conclude that M&K does not fit within the Compassionate Use Act's limited reimbursement exception. We also find that Hager presented sufficient credible evidence to the compensation court to establish that the prescribed medical marijuana represents, as to him, reasonable and necessary treatment under the WCA. Finally, we interpret Congress's appropriations actions of recent years as suspending application of the CSA to conduct that complies with the Compassionate Use Act. As applied to the Order, we thus find that the Act is not preempted and that M&K does not face a credible threat of federal criminal aiding-and-abetting or conspiracy liability. We therefore affirm the judgment of the Appellate Division.

## I.

## A.

The appellate record reveals the facts and procedural history pertinent to this appeal, and we begin in August 2001, when Hager was employed as a laborer for M&K. While working on a residential basement, Hager sought to retrieve cement in a wheelbarrow he was using. Something "like an explosion" resulted in the cement truck overpouring cement, "hurl[ing Hager] into the air" and "smashing [him] and flattening [him] back out like a

pancake." Thereafter, Hager experienced sharp back pain that radiated down his legs, and he was transferred to light duty. Hager never returned to full duty before leaving M&K in December 2001 due to his persistent back pain.

An MRI revealed spinal disc herniations and bulging and, in November 2003, Hager underwent a laminectomy and decompression of nerve roots in his back. He subsequently underwent a two-level lumbar fusion in September 2011, but his pain persisted and Hager continued to take prescribed opioid medication.[1]

In April 2016, Hager began treating with Dr. Joseph Liotta, M.D., a hospice and palliative care physician, who enrolled Hager in New Jersey's medical marijuana program both as an alternative pain treatment and as a means to wean him off of opioids. Initially prescribed one ounce per month, Hager was later prescribed two ounces per month -- the maximum allowable prescription -- costing him more than six hundred dollars each month.

B.

The procedural history of this matter is somewhat murky and largely irrelevant to the issues before us. In sum, Hager petitioned for workers' compensation benefits in February 2002. M&K denied the claim the following

---

[1] The record shows that since approximately 2006 Hager has received, in addition to any medical benefits that may have been provided by M&K, Supplemental Security Income and Medicaid benefits.

month, stating that the accident was being investigated. It was not until November 2016 that M&K stipulated that Hager was in its employ and suffered a work-related injury. The workers' compensation trial to determine the nature and extent of Hager's work-related injuries, and any unpaid medical benefits to which he was entitled began in November 2016 and continued over several scattered days until March 2018.

At trial, Hager presented the expert testimony of Dr. Liotta, who testified that he had diagnosed Hager with post-laminectomy syndrome resulting in chronic pain. Hager was also experiencing adverse side effects from his opioid medication, according to Dr. Liotta, and was "motivated" to cease its use. Hager stopped using opioids after about a month of treatment with marijuana. Dr. Liotta noted a "very weak" risk of chemical addiction to marijuana and fewer serious, and potentially fatal, side effects as compared to opioids. Also, Hager testified on his own behalf that medical marijuana helped wean him off opioids, took "the edge off" his pain, and helped with muscle spasms.

Hager also presented the testimony of orthopedist Dr. Cary Skolnick, M.D., who testified that Hager required long-term pain management due to his "chronic lumbar strain, lumbar herniated discs[,] . . . [and] post-laminectomy syndrome." Dr. Skolnick attributed Hager's condition to the August 2001

5

accident and concluded that he was 100% totally and permanently disabled, 65% attributable to his back injury and 35% attributable to the effects of his medication.

M&K presented the testimony of orthopedic surgeon Dr. Gregory Gallick, M.D., who concluded that Hager was only 12.5% permanently disabled and still capable of performing jobs such as driving. Dr. Robert Brady, D.O., also testified on behalf of M&K and described the potential side effects of medical marijuana, including cognitive difficulties, hallucinations, emphysema, chronic obstructive pulmonary disease, and lung cancer. Risks associated with opioids, according to Dr. Brady, include overdose, death, tolerance, depression, and sexual dysfunction. Though Dr. Brady opined that opioids are more physically addictive than marijuana, he represented that the two are equally psychologically addictive.

Citing medical literature, Dr. Brady testified that he did not prescribe his patients medical marijuana and added that medical marijuana had not been proven effective for conditions such as Hager's. Dr. Brady opined that brief physical therapy followed by a home-exercise regimen represented Hager's "best option" for relief. Dr. Brady did not recommend continued physician treatment or pain management because "[u]nfortunately, sometimes people have pain."

6

C.

At the time of the compensation court's decision, the parties had already reached an agreement regarding medical bills, most out-of-pocket medical expenses, temporary disability benefits, and third-party lien credits -- leaving the court to determine only the nature and extent of Hager's permanent disability and the necessary course of future treatment. The court concluded that Hager "exhibit[ed] Permanent Partial Total disability totaling 65%, approximately 50% attributable to his orthopedic condition and 15% attributable to the effects of the medical marijuana." The court also found no support for M&K's contention that Hager did not require further treatment.

Identifying medical marijuana and opioids as the only two choices for pain management, the court concluded that "marijuana is the clearly indicated option" and ordered M&K to reimburse the costs of Hager's medical marijuana and reasonably related expenses. The court found the testimony of Dr. Liotta and Hager to be credible as compared to that of Dr. Brady. Also important to the compensation court was Hager's ability to "conquer his addiction" to opioids. The court concluded that "the best interests of the injured worker must be a prime consideration under our workers' compensation scheme. It is likewise clear that the legislature intended to make available the benefits of medical marijuana to persons displaying a medical need, despite the federal

7

attitude toward the substance." The compensation court also rejected M&K's claim that, like a private health insurer or government medical benefit program, M&K could not be required to reimburse the cost of medical marijuana.

The Appellate Division affirmed both the compensation court's Order and, in response to Hager's cross-appeal, the court's finding that Hager "had a 65% permanent partial total disability." Hager v. M&K Constr., 462 N.J. Super. 146, 153, 171-72 (App. Div. 2020). After conducting a thorough analysis to determine whether the Compassionate Use Act is preempted by the CSA in the context of the Order, the Appellate Division concluded that the Act did not require employers to do what the CSA proscribes -- possess, manufacture, or distribute marijuana. Id. at 162-65. Compliance with both laws was thus possible, resulting in no positive conflict. Id. at 165. The Appellate Division also rejected M&K's contentions that compliance with the Order created potential aider-and-abettor liability that both preempted the Compassionate Use Act and placed M&K at risk of federal prosecution for assisting in Hager's possession of marijuana. Id. at 165-67. The court concluded that M&K lacked the requisite intent and active participation to support an aiding-and-abetting charge, and did not face a credible threat of federal prosecution. Id. at 166-67.

8

The Appellate Division also rejected M&K's argument that it should be treated like a private health insurer under the Compassionate Use Act and be exempt from reimbursing the cost of Hager's medical marijuana. Id. at 168. Finally, citing the testimony of Hager and Drs. Liotta and Skolnick, the court was satisfied that medical marijuana represents reasonable and necessary treatment for Hager. Id. at 170.

We granted M&K's petition for certification. 241 N.J. 484 (2020). We also granted leave to participate as amici curiae to the American Property Casualty Insurance Association (APCIA) and to a group of jointly participating organizations -- the National Organization for the Reform of Marijuana Laws; Garden State - NORML; the Coalition for Medical Marijuana - New Jersey; and Doctors for Cannabis Regulation -- which we refer to collectively here as "Other Amici."

## II.

Before us, M&K reiterates its position that, as applied to the compensation court's Order, the Compassionate Use Act is in actual conflict with the CSA because it compels M&K to do what the CSA prohibits -- assist in Hager's possession of marijuana. By reimbursing Hager, M&K argues it would be risking federal criminal charges for conspiracy and aiding-and-abetting because it will know that Hager is using the reimbursement to pay for

medical marijuana. Although the Appellate Division concluded that one cannot be liable for aiding-and-abetting a completed crime, M&K notes that Hager purchases marijuana on a monthly basis and characterizes the offense as ongoing.

M&K also sees no reason to differentiate between private health insurers and workers' compensation insurers; it argues that workers' compensation insurers should be afforded similar protection under the Compassionate Use Act and should not be required to reimburse an employee's medical marijuana costs. M&K further contends that medical marijuana is per se an unreasonable and unnecessary medical treatment because it is illegal under federal law. It adds that marijuana has not been proven to cure or improve back pain and that, unlike other medications, the quantity of a given dose of marijuana is at the discretion of the patient rather than the prescribing physician.

The APCIA reiterates M&K's general assertions, urging us to focus our attention on the fact that the Order impermissibly requires what federal law prohibits and directing our attention to the recent decision of the Maine Supreme Court in Bourgoin v. Twin Rivers Paper Co., 187 A.3d 10 (Me. 2018), which found in favor of a similarly situated employer. Marijuana use, in addition to having unproven medical value, is inconsistent with the safety goals of New Jersey's workers' compensation scheme, according to the

10

APCIA, and affirmance here would hamper employer enforcement of drug-free-workplace policies and efforts to prevent employees from being impaired on the job.

Hager counters that the Compassionate Use Act and the CSA are not in direct conflict because M&K can comply with both statutes. M&K is not itself being asked to engage in conduct violative of the CSA and is not subject to liability as an aider-and-abettor because it lacks specific intent, according to Hager. Hager adds that M&K faces no credible threat of federal prosecution and refers us to the fact that employers and workers' compensation carriers in New Mexico have not faced federal prosecution after being required to reimburse employees' medical marijuana costs. Citing the remedial purpose of the WCA and the New Jersey Legislature's recognition of the medical benefits of marijuana in alleviating chronic pain, Hager contends that he is entitled to reimbursement.

Other Amici likewise contend that the CSA and the Compassionate Use Act are not in conflict because the latter does not interfere with federal enforcement of the CSA, and does not require an employer to possess, manufacture, or distribute marijuana in violation of federal law. They describe M&K's aiding-and-abetting argument as a "legal impossibility" because the offense is completed by the time of reimbursement. Stressing that the

11

compensation court's finding that marijuana is an appropriate treatment for Hager is supported by the medical records and testimony provided, Other Amici ask us to affirm.

III.

As we turn to M&K's challenges to the determinations of the compensation court, affirmed by the Appellate Division, we are mindful that our review of workers' compensation decisions is "limited to whether the findings made could have been reached on sufficient credible evidence present in the record." Hersh v. County of Morris, 217 N.J. 236, 242 (2014) (quoting Sager v. O.A. Peterson Constr., Co., 182 N.J. 156, 164 (2004)). We acknowledge the compensation court's expertise and the valuable opportunity it has had in hearing live testimony, and we thus review its factual and credibility findings with "substantial deference." Goulding v. NJ Friendship House, Inc., 245 N.J. 157, 167 (2021) (quoting Ramos v. M & F Fashions, Inc., 154 N.J. 583, 594 (1998)). However, we review the court's legal findings and construction of statutory provisions de novo. Hersh, 217 N.J. at 243.

The issues presented in this appeal require consideration of New Jersey's Compassionate Use Act and the WCA on their own terms and in relation to one another, as well as the potential impact of the federal CSA on both state statutes. We begin by considering M&K's state-law based claims.

12

IV.

A.

The Compassionate Use Act, N.J.S.A. 24:6I-1 to -30, was enacted by the New Jersey Legislature in 2010 in recognition of the beneficial uses of marijuana and to protect authorized individuals from criminal and civil penalties. Wild v. Carriage Funeral Holdings, Inc., 458 N.J. Super. 416, 427 (App. Div. 2019), aff'd, 241 N.J. 285 (2020). The Act articulates legislative findings that: (1) "[m]odern medical research has discovered a beneficial use for cannabis in treating or alleviating the pain or other symptoms associated with certain medical conditions"; (2) ninety-nine out of every hundred marijuana arrests are made under state law, providing an opportunity to protect from arrest many seriously ill individuals in need of marijuana treatment; (3) though prohibited under federal law, many other states have legalized medical marijuana; and (4) states are not required to enforce federal law, meaning that the Act does not place New Jersey in violation of federal law. N.J.S.A. 24:6I-2(a) to (d).

Further, the Legislature, through the Act, seeks to make a "distinction . . . between medical and non-medical uses" of marijuana -- a distinction that it stresses "[c]ompassion dictates." Id. at -2(e). Accordingly, the Act has "the purpose . . . to protect from arrest, prosecution, . . . and criminal and other

13

penalties, those patients who use cannabis to alleviate suffering from qualifying medical conditions, as well as their health care practitioners, designated caregivers, institutional caregivers, and those who are authorized to produce cannabis for medical purposes." Ibid.; see also Wild, 458 N.J. Super. at 427; State v. Myers, 442 N.J. Super. 287, 298 (App. Div. 2015). "Qualifying medical condition[s]" include "chronic pain." N.J.S.A. 24:6I-3.

The Compassionate Use Act, perhaps most notably, applies the provisions of N.J.S.A. 2C:35-18 -- which establishes an affirmative defense to criminal liability under state law -- to patients, practitioners, caregivers, and others operating in accordance with the Act. N.J.S.A. 24:6I-6(a); see also Wild, 458 N.J. Super. at 427; Myers, 442 N.J. Super. at 300. Similarly, patients, practitioners, caregivers, and others abiding by the Act cannot be subject to any civil or administrative penalties or loss of any right or privilege. N.J.S.A. 24:6I-6(b).

In the employment context, the Compassionate Use Act does not alter preexisting employment rights and obligations. See Wild, 458 N.J. Super. at 428 (discussing the Act as it relates to the New Jersey Law Against Discrimination). The Act prohibits an adverse employment action against a registered patient "based solely on the employee's status as a registrant." N.J.S.A. 24:6I-6.1(a). However, the Act does not "require an employer to

14

commit any act that would cause the employer to be in violation of federal law, that would result in a loss of a licensing-related benefit pursuant to federal law, or that would result in the loss of a federal contract or federal funding." Id. at -6.1(c)(2).

Of relevance to the present matter, the Act provides that reimbursement for medical marijuana costs is not required of "a government medical assistance program or private health insurer." N.J.S.A. 24:6I-14. M&K argues that it is exempt from reimbursing Hager for his medical marijuana under that provision.

B.

Based on the plain language of the statute, we agree with the compensation court's determination, affirmed by the Appellate Division, that N.J.S.A. 24:6I-14 does not apply to M&K.

A provision of the statute, entitled "Construction of act," specifies in relevant part that "[n]othing in [the Compassionate Use Act] shall be construed to require a government medical assistance program or private health insurer to reimburse a person for costs associated with the medical use of cannabis." Ibid. (emphasis added). We read "or" as limiting the applicability of the exception to only those two kinds of entities. See Guttenberg Sav. & Loan Ass'n v. Rivera, 85 N.J. 617, 623 (1981) ("The use of the words 'lessee or

15

tenant' indicates the Legislature had in mind those occupants of residential dwelling units who had a certain correlative relationship with someone else, namely, a landlord or lessor. Otherwise the Legislature would have used a broader terminology."). It is "[a] general principle of statutory interpretation . . . that 'exceptions in a legislative enactment are to be strictly but reasonably construed, consistent with the manifest reason and purpose of the law.'" Prado v. State, 186 N.J. 413, 426 (2006) (quoting Serv. Armament Co. v. Hyland, 70 N.J. 550, 558-59 (1976)). Here, reading "or" as a limitation to the coverage exemption advances the Act's overarching and compassion-driven recognition of the potential health benefits of medical marijuana. See N.J.S.A. 24:6I-2(e).

The reading, further, is supported by the definition of "Health insurance" in the Life and Health Insurance Code, which unambiguously states "[h]ealth insurance does not include workmen's compensation coverages." N.J.S.A. 17B:17-4. If the Legislature sought to depart from that general definition and treat workers' compensation and private health coverage in the same manner under the Compassionate Use Act, it could have expressly included workers' compensation insurance in its exhaustive list or broadened the exception more generally, as other states have explicitly done. See Fla. Stat. § 381.986(15)(f) ("Marijuana . . . is not reimbursable . . . ."); 410 Ill. Comp. Stat. 130/40(d) ("Nothing in this Act may be construed to require a government medical

16

assistance program, employer, property and casualty insurer, or private health insurer to reimburse a person for costs associated with the medical use of cannabis."); Mich. Comp. Laws § 418.315a ("[A]n employer is not required to reimburse or cause to be reimbursed charges for medical marihuana treatment."); Mont. Code Ann. § 39-71-407(6)(c) ("Nothing in this chapter may be construed to require an insurer to reimburse any person for costs associated with the use of marijuana . . . ."); Okla. Stat. tit. 63 § 427.8(I) ("Nothing in this act . . . shall . . . [r]equire an employer, a government medical assistance program, private health insurer, worker's compensation carrier or self-insured employer providing worker's compensation benefits to reimburse a person for costs associated with the use of medical marijuana[.]"); R.I. Gen. Laws § 21-28.6-7(b)(1) (excepting from the requirement to reimburse medical marijuana costs a "workers' compensation insurer, workers' compensation group self-insurer, or employer self-insured for workers' compensation"); Utah Code Ann. § 26-61a-112 ("Nothing in this chapter requires an insurer, a third-party administrator, or an employer to pay or reimburse for cannabis, a cannabis product, or a medical cannabis device.").

We find that the Legislature's decision not to either list workers' compensation carriers or generally broaden the exclusion -- while at the same time including "chronic pain" as a qualifying medical condition under the Act,

17

N.J.S.A. 24:6I-3, when the WCA covers palliative care, as discussed in the next section of this opinion -- places our conclusion here within the clear contemplation of the Legislature.

In sum, we conclude that the Legislature clearly did not intend for workers' compensation insurers to be treated as private health insurers or government medical assistance programs under the Compassionate Use Act. M&K is therefore not exempt from its reimbursement obligation.

V.

A.

We next consider M&K's argument that medical marijuana is not a "reasonable and necessary treatment" for which the WCA provides coverage, and we begin with the WCA's legislative history and purpose. The WCA, N.J.S.A. 34:15-1 to -146, was enacted in 1911 to compensate workers injured in industrial accidents. Richard C. Henke, Workers' Compensation in New Jersey: Toward a Removal of Workers from the Sacrificial Altar of Production Quotas, 56 Rutgers L. Rev. 789, 796 (2004). The scope of the WCA thereafter expanded over the decades, id. at 796-97, and benefits payable to injured workers increased.

When it was first enacted, the WCA provided for "reasonable medical and hospital services and medicines" up to one hundred dollars during the two

18

weeks following an injury. L. 1911, c. 95, § 14. Today, the WCA requires employers to provide "such medical, surgical and other treatment . . . as shall be necessary to cure and relieve the worker of the effects of the injury," N.J.S.A. 34:15-15, incurred "in the course of employment," Univ. of Mass. Mem'l Med. Ctr., Inc. v. Christodoulou, 180 N.J. 334, 344 (2004). The statute specifies that "[a]ll fees and other charges for such physicians' and surgeons' treatment and hospital treatment shall be reasonable." N.J.S.A. 34:15-15. If an employer refuses or neglects to provide requested necessary treatment or services, the injured worker "may secure such treatment and services as may be necessary . . . and the employer shall be liable to pay therefor." Ibid.

Additionally, the WCA, as enacted and amended, is remedial in nature and is to be liberally construed. See, e.g., Squeo v. Comfort Control Corp., 99 N.J. 588, 604 (1985) ("[T]he construction of an apartment addition may be within the ambit of N.J.S.A. 34:15-15."); Howard v. Harwood's Rest. Co., 25 N.J. 72, 88, 94 (1957) (finding that continued nursing-home care was "necessary to cure and relieve" the worker's injuries). Failure to comply with a compensation court's order to pay benefits may lead to imposition of costs, fines, and other penalties. N.J.S.A. 34:15-28.2.

Still, the treatment or services sought by the injured worker "must be shown by competent medical testimony to be such as are reasonable and

19

necessary for the particular" worker. Howard, 25 N.J. at 93. Such evidence is the "touchstone" of determining what is reasonable and necessary. Squeo, 99 N.J. at 606; accord Martin v. Newark Pub. Schs., 461 N.J. Super. 330, 339 (App. Div. 2019) (finding that "there was sufficient, credible evidence in the record to support the compensation judge's determination that further treatment with opioid medication would not cure or relieve" the worker's condition). The injured worker's desires or beliefs as to what treatment or service will be most beneficial is not determinative. Squeo, 99 N.J. at 606. Further, "it must be shown that [the chosen] treatment is 'reasonable' and 'necessary' to cure or relieve the injury of the worker. A mere showing that the injured worker would benefit from the . . . treatment is not enough." Raso v. Ross Steel Erectors, Inc., 319 N.J. Super. 373, 383 (App. Div. 1999).

Nevertheless, palliative care may be properly authorized under the WCA, and workers who are permanently disabled and beyond hope of being cured are still entitled to continued treatment and services. Howard, 25 N.J. at 88, 93-94; Hanrahan v. Township of Sparta, 284 N.J. Super. 327, 333 (App. Div. 1995). Competent medical testimony that a particular treatment or service will reduce symptoms or restore function is sufficient to satisfy the requirement of reasonable and necessary care. Hanrahan, 284 N.J. Super. at 336.

20

B.

Like the compensation court and the Appellate Division, we too conclude that medical marijuana may be found, subject to competent medical testimony, to constitute reasonable and necessary care under New Jersey's workers' compensation scheme. See Howard, 25 N.J. at 93-94. Our decision in Squeo instructs our analysis here.

The petitioner in Squeo lost the use of his arms and legs at age twenty-four following a work-related fall; he argued that a self-contained apartment attached to his parents' home could constitute "other treatment" or "other appliance" under N.J.S.A. 34:15-15. 99 N.J. at 590-91. We affirmed the compensation court's order in favor of the petitioner, finding "that under certain unique circumstances, when there is sufficient and competent medical evidence to establish that the requested 'other treatment' or 'appliance' is reasonable and necessary to relieve the injured worker . . . the construction of an apartment addition may be within the ambit of N.J.S.A. 34:15-15." Id. at 604, 607. In arriving at that conclusion, we looked beyond the petitioner's physical condition and also considered the psychological harm resulting from his work-related injuries; that harm was "aggravated" by the then-offered treatment -- placement in a nursing home -- which resulted in multiple suicide attempts. Id. at 605.

21

In this appeal, Drs. Skolnick and Liotta persuaded the compensation court that Hager remains in chronic pain and that ongoing treatment is necessary. Identifying medical marijuana and opioids as the two treatment options available, the court concluded, after thoughtful consideration of the medical testimony discussing the risks and benefits of each, that marijuana was "the clearly indicated option." Persuasive to the court was marijuana's ability to both provide pain relief and help Hager "conquer his addiction" to opioids.

Reimbursement payments for the cost of Hager's prescribed medical marijuana -- the treatment ordered here -- may not yet be common, but they are certainly less unique than the construction we found appropriate in Squeo. Indeed, marijuana's ability to relieve pain has been expressly recognized by the Legislature in the Compassionate Use Act. N.J.S.A. 24:6I-2(a), -3. Thus, competent evidence relating to medical marijuana's ability to restore some of a worker's function or, as in Hager's case, relieve symptoms such as chronic pain and discomfort, is sufficient to find such a course of treatment appropriate. See Hanrahan, 284 N.J. Super. at 336.

As in Squeo, we recognize the potential harm that may be inflicted on Hager by the alternative available treatment. The compensation court noted that the record reflected that treatment with opioids had placed Hager on a "likely path . . . [of] worsening addiction and ultimately death." It favored the

22

testimony of Hager's experts over that of M&K's, which was within its discretion to do, that marijuana was comparatively the "appropriate" option to address both Hager's chronic pain and the adverse effects of years of opioid use. Rather than "throw [Hager] back to the trash heap," the court entered its Order to reimburse Hager's marijuana use, both to manage his pain and support his efforts to overcome his addiction.

We agree with the compensation court and Appellate Division that exempting workers' compensation insurance carriers from responsibility for workers' medical marijuana costs would be antithetical to the Legislature's express findings in the Compassionate Use Act and the traditional broad, liberal application of New Jersey's workers' compensation scheme. Sufficient credible evidence in the compensation court record -- medical records and hearing testimony -- supported the Order. We will not disturb it. Goulding, 245 N.J. at 167.

Having found that M&K is obliged to reimburse Hager under the Compassionate Use Act and the WCA, we next consider whether the federal CSA -- which classifies marijuana among the most rigorously controlled substances and criminalizes the possession and distribution of marijuana, as discussed in Section VI.C. below -- extinguishes M&K's obligations under state law.

23

VI.

A.

We begin our discussion of the intersection of federal and state law here with the recognition that New Jersey law diverges from federal law not just as to medical marijuana but as to its recreational use as well. Indeed, at present, New Jersey's marijuana laws are undergoing a tectonic shift. In November 2020, New Jerseyans voted to legalize recreational marijuana via constitutional amendment by a two-to-one margin. Troy Closson, Marijuana Is Legal in New Jersey, but Sales Are Months Away, N.Y. Times (Feb. 22, 2021), https://www.nytimes.com/2021/02/22/nyregion/new-jersey-marijuana-legalization.html. As of January 1, 2021, the "growth, cultivation, processing, manufacturing, preparing, packaging, transferring, and retail purchasing and consumption of cannabis, or products created from or which include cannabis, by persons 21 years of age or older . . . shall be lawful and subject to regulation by the Cannabis Regulatory Commission." N.J. Const. art. IV, § 7, ¶ 13.

In February 2021, Governor Philip D. Murphy signed three bills into law, giving practical effect to New Jersey's marijuana legalization. See Press Release: Governor Murphy Signs Historic Adult-Use Cannabis Reform Bills Into Law (Feb. 22, 2021), https://nj.gov/governor/news/news/562021/

24

approved/20210222a.shtml. Though the ability to purchase recreational marijuana remains months away, the legislation ended arrests for possession of small amounts of marijuana, which numbered in the thousands even after the amendment's effective date. Amanda Hoover, Murphy Signs N.J. Legal Weed Bills, Ending 3-Year Saga, NJ.com (Feb. 22, 2021), https://www.nj.com/marijuana/2021/02/murphy-signs-nj-legal-weed-bills-ending-3-year-saga.html.

The most expansive of the three bills, the New Jersey Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act, amended the Code of Criminal Justice to exempt from any criminal or civil punishment possession of six ounces or less of marijuana or seventeen grams or less of hashish. L. 2021, c. 16, § 56. Possession of greater quantities is a fourth-degree offense. Ibid. A separate bill set forth penalties for the possession and use of marijuana by those under the age of twenty-one. See S. 3454 (2021). The new legislation also prohibits state law enforcement from cooperating with federal authorities in enforcing the CSA. L. 2021, c. 16, § 52.

While workers may be drug tested under this new regime, an employer may not take adverse action against an employee due to the employee's consumption of marijuana or the presence of cannabinoid metabolites in their bodily fluid resulting from permitted conduct. Id. § 48. Presence of such

25

metabolites may, however, result in penalties or refusal to employ if it causes the employer to violate a federal contract or lose federal funding. Id. § 47. Those express deferential references to federal law recognize that state law may not permit what federal law forbids, a principle as true for our recreational use legislation as for our Compassionate Use Act.

B.

Notwithstanding New Jersey's legalization of the medical and recreational use of marijuana, the CSA must be considered because, under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, "state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." Puglia v. Elk Pipeline, Inc., 226 N.J. 258, 274 (2016) (quoting Wis. Pub. Intervenor v. Mortier, 501 U.S. 597, 604 (1991)). The principles of federal preemption are rooted in the Supremacy Clause, In re Reglan Litig., 226 N.J. 315, 328 (2016), which "unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail," Gonzales v. Raich, 545 U.S. 1, 29 (2005).

"Pre-emption may be either expressed or implied . . . ." Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992). Congress may choose to preempt state law with the express language of an enactment. Franklin Tower One, L.L.C. v. N.M., 157 N.J. 602, 615 (1999). In the alternative, there are

26

two forms of implied preemption: field and conflict. Reglan, 226 N.J. at 328. "Field preemption applies 'where the scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."'" Ibid. (quoting Gade, 505 U.S. at 98). Express and field preemption do not apply to the present matter, because the CSA explicitly leaves room for state law to operate:

> No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.
>
> [21 U.S.C. § 903.]

We therefore focus on conflict preemption. "[I]n the absence of express language or implied congressional intent to occupy the field, a court must find state law to be preempted 'to the extent that it actually conflicts with federal law.'" Maher v. N.J. Transit Rail Operations, Inc., 125 N.J. 455, 464 (1991) (quoting Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Local 54, 468 U.S. 491, 501 (1984)). Conflict preemption requires an actual -- rather than hypothetical or speculative -- conflict between federal and state law. Feldman v. Lederle Labs., 125 N.J. 117, 135 (1991).

27

Conflict preemption occurs in two scenarios. First, conflict preemption arises "where it is 'impossible for a private party to comply with both state and federal requirements.'" PLIVA, Inc. v. Mensing, 564 U.S. 604, 618 (2011) (quoting Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)). The second context in which conflict preemption applies is when "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Reglan, 226 N.J. at 329 (quoting Gade, 505 U.S. at 98). "When there is a conflict, 'the federal law must prevail.'" Feldman, 125 N.J. at 135 (quoting Free v. Bland, 369 U.S. 663, 666 (1962)). The importance of the state law is immaterial to a conflict preemption analysis when a valid federal statute is present. Maher, 125 N.J. at 465.

"[P]re-emption is not to be lightly presumed." Franklin Tower One, 157 N.J. at 615 (quoting Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 281 (1987)). "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to . . . tolerate whatever tension there [is] between them." Wyeth v. Levine, 555 U.S. 555, 575 (2009) (alteration in original) (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 166-67 (1989)).

Central to our preemption analysis, therefore, is deciphering congressional intent. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 208 (1985) ("[T]he question whether a certain state action is pre-empted by federal law is one of congressional intent. '"The purpose of Congress is the ultimate touchstone."'" (quoting Malone v. White Motor Corp., 435 U.S. 497, 504 (1978))). We must approach that task by examining not only the CSA's plain language, see United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 11 (2008), but also "the purposes Congress sought to serve" through its enactment, see Chapman v. Hous. Welfare Rts. Org., 441 U.S. 600, 608 (1979). We must also look beyond the language of the statute to the broader framework in which the statute resides. See Village of Ridgefield Park v. N.Y., Susquehanna & W. Ry. Corp., 163 N.J. 446, 453 (2000). Ultimately, a determination of "[w]hether a state law stands as an obstacle to the accomplishment of a federal objective[] requires a court to consider 'the relationship between state and federal laws as they are interpreted and applied, not merely as they are written.'" R.F. v. Abbott Labs., 162 N.J. 596, 618 (2000) (quoting Jones v. Rath Packing Co., 430 U.S. 519, 526 (1977)).

With those principles in mind, we turn to the CSA.

C.

Enacted by Congress in 1970, the CSA sought "to conquer drug abuse and to control the legitimate and illegitimate traffic [of] controlled substances." Raich, 545 U.S. at 12. The CSA replaced a network of drug laws with a "comprehensive regime." Ibid.; see also 116 Cong. Rec. 33,300 (statement of Rep. Springer) ("[T]he purpose of this act is to bring together the various laws affecting drugs in order to codify and consolidate them. It is intended to make enforcement more uniform . . . ."). "Congress intended [for] the CSA to strengthen rather than to weaken the prior drug laws." United States v. Moore, 423 U.S. 122, 139 (1975). The CSA separates controlled substances into five schedules based on their accepted medical uses, risk of abuse, and physical and psychological effects. Raich, 545 U.S. at 13. Substances may not be placed on a particular schedule without specific findings. 21 U.S.C. § 812(b). The Attorney General is empowered to add, remove, and reschedule substances, id. § 811(a), and has delegated that authority to the Drug Enforcement Administration, United States v. Kelly, 874 F.3d 1037, 1042 (9th Cir. 2017); 28 C.F.R. § 0.100(b).

Marijuana was placed in the strictest schedule -- Schedule I -- at the time of the CSA's enactment. Raich, 545 U.S. at 14. Substances on Schedule I must be found to have a high potential for abuse, no currently accepted use for

30

medical treatment, and a lack of accepted safety measures for use under medical supervision.  21 U.S.C. § 812(b)(1).  Marijuana remains a Schedule I drug today, id. § 812(c), Schedule I(c)(10), despite repeated efforts to petition for its rescheduling, Nation v. Trump, 395 F. Supp. 3d 1271, 1275 (N.D. Cal. 2019).  That original placement reflected concerns among legislators at the time about the increasing prevalence of marijuana, particularly among young people, see 116 Cong. Rec. 33,649-50 (statements of Reps. Anderson and Keith), although not all members of Congress agreed that it warranted such classification, see 116 Cong. Rec. 33,660 (statement of Rep. Ryan) ("[M]arihuana is found on schedule I with such drugs as heroin, morphine, and LSD . . . .  [T]he studies which have thus far been completed show that whatever harmful effects marihuana may have, they are not comparable to the effects of the other drugs on schedule I.").

Except as otherwise authorized, the CSA makes it unlawful to knowingly or intentionally "possess with intent to manufacture, distribute, or dispense, a controlled substance."  21 U.S.C. § 841(a)(1).  The CSA also makes unlawful, subject to exceptions, the knowing or intentional possession of a controlled substance "unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice."  Id. § 844(a).

31

The "valid prescription" language contained in § 844(a) cannot, however, apply to marijuana because the CSA prevents marijuana from being validly prescribed.  See United States v. Johnson, 228 F. Supp. 3d 57, 62 (D.D.C. 2017) (citing United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 491 (2001)); United States v. Harvey, 794 F. Supp. 2d 1103, 1105-06 (S.D. Cal.), aff'd, 659 F.3d 1272 (9th Cir. 2011).  Thus, marijuana is not included in the CSA's prescription requirements, see 21 U.S.C. § 829, because "for purposes of the [CSA], marijuana has 'no currently accepted medical use' at all," Oakland Cannabis Buyers' Coop., 532 U.S. at 491 (quoting one of the Schedule I criteria).

On the enforcement front, guidance from senior personnel in the Department of Justice (DOJ) to the offices of the United States Attorneys issued over the past decade or so has, at times, deprioritized -- but not prohibited -- federal prosecution of marijuana activities that are legal under state law.  For example, in 2009, Deputy Attorney General David Ogden advised United States Attorneys that they "should not focus federal resources . . . on individuals whose actions are in clear and unambiguous compliance with existing state laws providing for the medical use of marijuana," but rather prioritize larger-scale trafficking operations.  Memorandum for Selected United States Attorneys 1-2 (Oct. 19, 2009).

Four years later, as state ballot initiatives sought to legalize possession of small quantities of marijuana, Deputy Attorney General James Cole reiterated the DOJ's commitment to enforcing the CSA but provided eight priorities in light of limited DOJ resources, which included preventing: distribution to minors, marijuana revenue from reaching criminal enterprises, violence or the use of firearms in marijuana cultivation and distribution, and growth of marijuana on public lands. Memorandum for All United States Attorneys 1-2 (Aug. 29, 2013) (2013 Cole Memo). Cole acknowledged the DOJ's traditional reliance on state and local authorities in addressing lower-level marijuana activity through enforcement of their own laws and advised that states with strong regulatory and enforcement systems were less likely to threaten federal priorities. Id. at 2-3.

Following the change of administrations, Attorney General Jefferson B. Sessions, III, advised that "[g]iven the Department's well-established general principles, previous nationwide guidance specific to marijuana enforcement is unnecessary and is rescinded, effective immediately." Memorandum for All United States Attorneys 1 (Jan. 4, 2018). Attorney General William Barr reversed course to some extent, stating that he was "accepting the Cole Memorandum for now," but that he had "generally left it up to the U.S. Attorneys in each state to determine what the best approach is in that state."

33

Sara Brittany Somerset, <u>Attorney General Barr Favors A More Lenient Approach to Cannabis Prohibition</u>, <u>Forbes</u> (Apr. 15, 2019), https://www.forbes.com/sites/sarabrittanysomerset/2019/04/15/attorney-general-barr-favors-a-more-lenient-approach-to-cannabis-legalization/?sh=6e82d477c4c8.

Significantly, it is not only the Executive Branch that has muddied the waters between state marijuana laws and federal enforcement; more importantly, Congress has also deprioritized prosecution for possession of medical marijuana while leaving the CSA otherwise unchanged.

In the relevant rider to the most recent federal Appropriations Act, Congress prohibited the DOJ from using allocated funds to prevent states, including New Jersey, from implementing their medical marijuana laws. <u>See</u> Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 531, 134 Stat. 1182, 1282-83 (2020). Specifically, § 531 provides that

> [n]one of the funds made available under this Act to the Department of Justice may be used, with respect to any of the States of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and

34

Wyoming, or with respect to the District of Columbia, the Commonwealth of the Northern Mariana Islands, the United States Virgin Islands, Guam, or Puerto Rico, to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

[Ibid.]

Similar language has been included in appropriations riders dating back to the 2015 federal budget, although the list of states and territories with medical marijuana legislation has been expanded over the years to reflect new enactments.  See Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 531, 133 Stat. 2317, 2431 (2019); Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 537, 133 Stat. 13, 138 (2019); Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 538, 132 Stat. 348, 444-45 (2018); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 537, 131 Stat. 135, 228 (2017); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 542, 129 Stat. 2242, 2332-33 (2015); Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014); see also United States v. Kleinman, 880 F.3d 1020, 1027 (9th Cir. 2017) (noting that the riders for the years 2015 through 2017 were "essentially the same" (quoting United States v. Nixon, 839 F.3d 885, 887 (9th Cir. 2016))).

It appears from the Congressional Record that the impetus for these riders has its origins in the Tenth Amendment -- reserving to the states powers not granted to the federal government -- and they reflect Congress's intention to limit the role of federal policy in matters of criminal justice. See 160 Cong. Rec. H4878 (daily ed. May 28, 2014) (statement of Rep. Rohrabacher) ("It should be disturbing to any constitutionalist that the Federal Government insists on the supremacy of laws that allow for the medical use of marijuana."). These continuing riders have "changed" federal law by prohibiting the DOJ "from spending appropriated funds to prosecute individuals who are acting in compliance with their State's medical marijuana laws" and "restrict[ing] the Federal Government from superseding State law when it comes to the use of medical marijuana." 163 Cong. Rec. H311 (daily ed. Jan. 11, 2017) (statement of Rep. Rohrabacher).

The tension between Congress's appropriations riders and the CSA's classification and criminalization of marijuana is manifest. Mindful that preemption analysis turns on legislative intent, see Lueck, 471 U.S. at 208, we turn to case law examining whether and under what circumstances appropriations acts -- reflecting a shift in intent with respect to earlier legislation -- are deemed to impliedly suspend or supplant the earlier law.

D.

In considering the effect of the recent appropriations riders on the CSA as applied to the Order, we find particularly instructive guidance from the United States Supreme Court and several circuit courts. See Glukowsky v. Equity One, Inc., 180 N.J. 49, 64 (2004) ("[T]he principle of comity instructs state courts to give due regard to a federal court's interpretation of a federal statute.").

For example, in United States v. Dickerson, the Supreme Court stated that "[t]here can be no doubt that Congress could suspend or repeal [an] authorization . . . and it could accomplish its purpose by an amendment to an appropriation bill, or otherwise." 310 U.S. 554, 555 (1940); accord United States v. Will, 449 U.S. 200, 222 (1980). And "although repeals by implication are especially disfavored in the appropriations context, Congress nonetheless may amend substantive law in an appropriations statute, as long as it does so clearly." Robertson v. Seattle Audubon Soc'y, 503 U.S. 429, 440 (1992) (citation omitted); see also Me. Cmty. Health Options v. United States, 590 U.S. ___, 140 S. Ct. 1308, 1323-27 (2020) (concluding that Congress's failure to fund Patient Protection and Affordable Care Act obligations did not impliedly repeal the ACA). Harmonizing conflicting statutes is preferred, but courts are not required to "approach the statute[s] with blinders and reconcile

37

them at all costs, even when the second enactment is an appropriations measure." Preterm, Inc. v. Dukakis, 591 F.2d 121, 133 (1st Cir. 1979).

Though it did not discuss implied repeal, United States v. McIntosh tasked the Ninth Circuit with resolving an issue similar to the one at hand -- determining whether the 2016 appropriations rider prohibiting DOJ interference with state medical marijuana laws prevented the DOJ from prosecuting activities allegedly compliant with state law. 833 F.3d 1163, 1168-70 (9th Cir. 2016). The court concluded that it did, stating that "at a minimum, [the rider] prohibit[ed the] DOJ from spending funds from relevant appropriations acts for the prosecution of individuals who engaged in conduct permitted by the State Medical Marijuana Laws and who fully complied with such laws." Id. at 1176-77. In so concluding, the Ninth Circuit recognized the "temporal nature" of the issue -- Congress could restore funding for such prosecutions any day or never again -- but concluded that, if the DOJ sought to continue prosecuting the appellants, the appellants were entitled to evidentiary hearings to determine whether they strictly complied with state law. Id. at 1179; see also Tin Cup, LLC v. U.S. Army Corps of Eng'rs, 904 F.3d 1068, 1073 (9th Cir. 2018) ("There is . . . 'a very strong presumption' that if an appropriations act changes substantive law, it does so only for the fiscal year for which the bill was passed." (quoting Bldg. & Constr. Trades Dep't, AFL-

CIO v. Martin, 961 F.2d 269, 273 (D.C. Cir. 1992))); Strawser v. Atkins, 290 F.3d 720, 734 (4th Cir. 2002) ("'Where Congress chooses' to amend substantive law in an appropriations rider, '[courts] are bound to follow Congress's last word on the matter even in an appropriations law.'" (quoting City of Los Angeles v. Adams, 556 F.2d 40, 49 (D.C. Cir. 1977))).

Those federal decisions ring familiar because they mirror our own reading of appropriations acts as signifiers of legislative intent to suspend earlier statutory enactments. See City of Camden v. Byrne, 82 N.J. 133, 154-55 (1980). In Byrne, a collection of municipalities and counties brought actions against Governor Brendan T. Byrne, the Legislature, and other government officials for failure to appropriate and expend state funds allotted by several statutes to municipalities and counties. Id. at 141-44. The allocations were not made because they were excluded from the Legislature's general appropriations acts or eliminated by Governor Byrne's line-item veto. Id. at 142-44.

After discussing the constitutional issues implicated in the matter, we moved to the defendants' contention that the statutes had been suspended, supplanted, or repealed by the subsequent passage of annual appropriations acts, which intentionally excluded the expenditures. Id. at 153. The appropriations acts and original statutes were irreconcilable because they made

39

different uses of the same limited funds.  Ibid.  Although we recognized a strong presumption against any implied nullification of statutes, we concluded that "this presumption may be overcome when there is a clear showing that two legislative measures are patently repugnant or inconsistent." Id. at 154. To so find, we looked to the intent of the Legislature.  Ibid.

Applied to the facts presented in Byrne, we found that the failure to appropriate the funding called for in the statutes was an intentional act of the Legislature, as was its decision not to override the Governor's line-item vetoes.  Ibid.  Such unmistakable legislative intent reflected in the appropriations laws "necessarily supersede[d] any previously expressed legislative desires at least for the duration of the particular appropriation act." Ibid.  We thus read the appropriations acts as the manifested intent of the Legislature to give no effect at all to the earlier statutes, stating that "[t]he earlier statutes [could not] coexist with the enacted appropriation and, consequently, must be deemed [to have been] suspended by adoption of the later appropriation acts." Id. at 154-155.

We noted, as well, the limited applicability of appropriations laws -- confined to a particular fiscal year -- and concluded that their effect on the previously enacted statutes was best expressed as implied suspension as opposed to implied repeal, even though that limitation did not change our

40

general analysis. Id. at 153-54; see also McIntosh, 833 F.3d at 1179 (recognizing the "temporal nature" of Congress's appropriations rider as applied to DOJ enforcement of the CSA). Our courts continue to recognize appropriations acts as expressions of legislative intent. See Guaman v. Velez, 421 N.J. Super. 239, 258 (App. Div. 2011); Mid-Atl. Solar Energy Indus. Ass'n v. Christie, 418 N.J. Super. 499, 505-06 (App. Div. 2011).

E.

With federal case law and Byrne as our guides to deciphering congressional intent here, we conclude that it is possible for M&K to abide by both the CSA and the Compassionate Use Act at the present time, and that the latter does not currently create an obstacle to the accomplishment of congressional objectives. As such, the Compassionate Use Act is not preempted by the CSA as applied to the Order.

The perceived tension, as stated, stems from the Order entered against M&K. See N.J.S.A. 34:15-28.2 (providing for penalties that may be imposed on employers and insurers that fail to comply with compensation court orders). Though the Compassionate Use Act shields those acting in compliance with its provisions from criminal liability, see N.J.S.A. 24:6I-6(a), marijuana possession remains illegal under federal law, 21 U.S.C. §§ 841(a), 844(a). This despite Congress's present will to defund DOJ actions that prevent states

41

from implementing their own medical marijuana laws, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 531, 134 Stat. 1182, 1282-83 (2020), including prosecuting those complying with state law, see McIntosh, 833 F.3d at 1176-77.

Byrne instructs us to read statutes and subsequent appropriations acts in tandem. To do as M&K asks -- to focus purely on whether state law permits and, in this case, demands what federal law forbids -- would be to completely disregard the most recent expression of Congress's intent in its appropriations acts. See Strawser, 290 F.3d at 734. We find that doing so would be incongruous with the task before us and do not so limit ourselves here. We must also consider the broader framework in which the statutes exist. See Village of Ridgefield Park, 163 N.J. at 453.

Here, the CSA expressly contemplates a role for state law absent a "positive conflict" with the CSA. See 21 U.S.C. § 903; see also Gonzales v. Oregon, 546 U.S. 243, 251 (2006) (discussing Schedule II controlled substances). DOJ guidance has acknowledged both federal prosecutors' historic reliance on state and local laws and law enforcement in addressing lower-level marijuana offenses and the fact that state marijuana laws generally do not conflict with federal investigative and prosecutorial priorities. 2013 Cole Memo, supra, at 2-3. The Compassionate Use Act thus seeks to operate

in the space afforded to it by federal law and federal priorities.  See N.J.S.A. 24:6I-2(c) to (d) (noting the collection of other states that have enacted similar medical marijuana programs and finding that the Act does not place New Jersey in violation of federal law).

Congress has, for seven consecutive fiscal years, prohibited the DOJ from using funds to interfere with state medical marijuana laws through appropriations riders.  The present rider and its predecessors have "changed" federal law and "restrict[ed] the Federal Government from superseding State law when it comes to the use of medical marijuana."  See 163 Cong. Rec. H311 (daily ed. Jan. 11, 2017) (statement of Rep. Rohrabacher).  The rider language leaves "no doubt" as to its effect by "forbid[ding] the use of funds" to interfere with state medical marijuana schemes.  See The Last Best Beef, LLC v. Dudas, 506 F.3d 333, 339-40 (4th Cir. 2007) (holding that "Congress intended to enact a discrete and narrow exception to the Lanham Act" via an appropriations action).  Despite McIntosh's inviting correction by Congress, 833 F.3d at 1179 ("If Congress intends to prohibit a wider or narrower range of DOJ actions, it certainly may express such intention, hopefully with greater clarity, in the text of any future rider."), those riders have used substantially the same language year after year.  It appears to us that this repeated language is Congress speaking with complete awareness of McIntosh and absolute

43

approval of its reasoning. See 163 Cong. Rec. H311 (daily ed. Jan. 11, 2017) (statement of Rep. Rohrabacher) ("Importantly . . . the Ninth Circuit Court of Appeals ruled in [McIntosh] that Federal funds cannot be used to prosecute those in compliance with their State's medical marijuana laws. This provision will be part of American law as long as it is renewed and Congress makes it part of the law."). Congress is empowered to amend the CSA via an appropriations action provided "it does so clearly," see Robertson, 503 U.S. at 440, and the most recent appropriations rider, in our view, "clearly is intended as a substitute" to the CSA as applied to the Compassionate Use Act, see Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs, 619 F.3d 1289, 1299 (11th Cir. 2010). Therefore, we find that Congress has spoken through the most recent appropriations rider and give it the final say. Strawser, 290 F.3d at 734; Adams, 556 F.2d at 48-49.

We thus conclude that the CSA, as applied to the Compassionate Use Act and the Order at issue, is effectively suspended by the most recent appropriations rider for at least the duration of the federal fiscal year and that it would be "inappropriate for this Court to give any legal effect whatsoever to the earlier statutory enactment[]." Byrne, 82 N.J. at 154-55. "The earlier statute[] cannot coexist with the enacted appropriation and, consequently, must be deemed to be suspended by adoption of the later appropriation act[]." Id. at

44

154. We repeat that "[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to . . . tolerate whatever tension there [is] between them." Wyeth, 555 U.S. at 575 (second alteration in original) (quoting Bonito Boats, Inc., 489 U.S. at 166-67).

As in Byrne, we find here that this clear, volitional act in the form of appropriations law takes precedence over the earlier legislation. Because DOJ enforcement of the CSA may not, by congressional action, interfere with activities compliant with the Compassionate Use Act, we find that there is no "positive conflict" and that the CSA and the Act may coexist as applied to the Order. See 21 U.S.C. § 903. Qualified patients may continue to possess and use medical marijuana, and related compensation orders may be entered while federal authorities continue to enforce the CSA to the extent Congress permits. The federal and state acts can thus "consistently stand together," see ibid., and it is possible for M&K to comply with both, see Mensing, 564 U.S. at 618. The Compassionate Use Act does not currently present an obstacle to Congress's objectives as articulated in the recent appropriations riders, see Reglan, 226 N.J. at 329, and so the CSA does not preempt the Compassionate Use Act as applied to the Order. As we have previously recognized, and we find to be the case here with respect to the recent appropriations riders' effect

on the CSA, "legislative intent through appropriation actions . . . sometimes speak[s] louder than words." State v. Cannon, 128 N.J. 546, 568 (1992).

We acknowledge that our decision here departs from the holdings of other state supreme courts that have come to different conclusions when faced with the precise issue before us -- whether state medical marijuana laws are preempted as applied to workers' compensation orders compelling employers to reimburse workers' medical marijuana costs. See Bourgoin, 187 A.3d at 22 ("Because the CSA preempts the [Maine Medical Use of Marijuana Act] when the [Act] is used as the basis for requiring an employer to reimburse an employee for the cost of medical marijuana, the order based on the [Act] must yield."); Wright's Case, 156 N.E. 3d 161, 175 (Mass. 2020) (concluding that the plain language of the state reimbursement limitation provision prohibited compelling workers' compensation insurers to reimburse the cost of medical marijuana).

We are urged to follow suit with Bourgoin and Wright's Case. However, while we may find their reasoning instructive, they in no way bind our Court or predetermine our analysis. See Matthews v. City of Atl. City, 84 N.J. 153, 162 (1980). Our decision today is consonant with our reading of the relevant federal authorities and our settled principles of preemption analysis and deciphering legislative intent.

46

Additionally, after oral argument, the New Hampshire Supreme Court concluded that there is "no direct conflict" between the CSA and a state order to reimburse a worker's medical marijuana costs and that reimbursement did not represent an obstacle to congressional objectives. Appeal of Panaggio, ___ A.3d ___, ___ (N.H. 2021) (slip op. at 6, 11). Agreeing with the Bourgoin dissent and our Appellate Division's decision in this case, Panaggio also found that the insurer would lack the active participation and mens rea necessary for aiding-and-abetting liability, id. ___ (slip op. at 8), which we will address in the next section.

We close by repeating the "temporal nature" of the issue before us and its dependence on the future acts of Congress. See McIntosh, 833 F.3d at 1179. Funding to support federal prosecution of those acting within the scope of the Compassionate Use Act may be restored soon, or never again. We regard the CSA as suspended, rather than repealed, with respect to orders like the one at issue here because the appropriations rider on which we rely is of a limited lifespan and may be repeated, removed, or changed within the year. See Byrne, 82 N.J. at 153.

F.

Our preemption analysis notwithstanding, we address M&K's contention that its compliance with the Order would subject it to aiding-and-abetting

47

liability under 18 U.S.C. § 2 on the theory that it would be assisting in Hager's possession of marijuana, contrary to the CSA. M&K counters the Appellate Division's conclusion "that 'one cannot aid and abet a completed crime,'" Hager, 462 N.J. Super. at 166 (quoting United States v. Ledezma, 26 F.3d 636, 642 (6th Cir. 1994)), by claiming that the offense at issue here is ongoing as opposed to completed. It similarly argues that its compliance risks conspiracy liability under 21 U.S.C. § 846. We are unpersuaded.

"To aid and abet a crime, a defendant must not just 'in some sort associate himself with the venture,' but also 'participate in it as in something that he wishes to bring about' and 'seek by his action to make it succeed.'" Rosemond v. United States, 572 U.S. 65, 76 (2014) (quoting Nye & Nissen v. United States, 336 U.S. 613, 619 (1949)). Proof is required "that the defendant had the specific intent to facilitate the crime." United States v. Centeno, 793 F.3d 378, 387 (3d Cir. 2015). To support an aiding-and-abetting conviction, "the Government must prove: '(1) that another committed a substantive offense; and (2) the one charged with aiding and abetting knew of the commission of the substantive offense and acted to facilitate it.'" Ibid. (quoting United States v. Mercado, 610 F.3d 841, 846 (3d Cir. 2010)). "[W]hether he participates with a happy heart or a sense of foreboding" is of

48

no matter, provided the accomplice "knowingly <u>elected to</u> aid in the commission of" the offense.  <u>Rosemond</u>, 572 U.S. at 79-80 (emphasis added).

By the very nature of its appeals to both the Appellate Division and this Court, M&K has made it clear that it does not wish to "participate" and "act[] to make . . . succeed" the federal offense in question here -- Hager's possession of marijuana.  It has gone to great pains to avoid facilitating an offense.  We trust that our affirmance of the compensation court's Order will not change M&K's position.  Likewise, reimbursing Hager under court mandate can hardly be interpreted as M&K "elect[ing]" to aid in Hager's possession of marijuana, contrary to federal law.  Rather, it is being compelled to do so by the Order.

Even accepting M&K's contention that the court-mandated reimbursement payments constitute an ongoing offense in which the reimbursement for one illegal purchase and possession enables the next, it fails to show -- and we strain to find -- how its compliance with the Order exhibits a specific intent to aid-and-abet Hager's marijuana possession.  M&K's position that it faces aiding-and-abetting liability because it will reimburse Hager while knowing what the funds will be used for does not persuade us that it satisfies the specific intent requirement when the facts so clearly indicate that it will be doing so against its will and at the behest of this Court.

49

M&K's argument that compliance with the Order places it at risk of conspiracy liability must also fail for similar reasons. Any individual who conspires to commit an offense prohibited by the CSA "shall be subject to the same penalties as those prescribed for the offense." 21 U.S.C. § 846. A conspiracy charge under § 846 "can only be sustained if the defendant 'knowingly and intentionally became a member of the conspiracy.'" United States v. Ruiz, 932 F.2d 1174, 1182 (7th Cir. 1991) (quoting the Seventh Circuit's Pattern Criminal Federal Jury Instructions for conspiracy). "[T]he government must show . . . that the alleged conspirators shared a 'unity of purpose[,'] the intent to achieve a common goal, and an agreement to work together toward the goal." United States v. Korey, 472 F.3d 89, 93 (3d Cir. 2007) (quoting United States v. Cartwright, 359 F.3d 281, 286 (3d Cir. 2004)).

Again, we are unable to discern a "unity of purpose" from M&K's repeated attempts to disassociate itself from Hager's marijuana possession and use. The parties are of two competing minds on the subject and M&K went as far as to present testimony before the compensation court that Hager does not require any treatment at all -- let alone the ongoing prescription of medical marijuana. Likewise, to the extent that the Order requiring reimbursement payments creates a conspiracy between Hager and M&K, M&K's membership

50

cannot be said to be intentional.  Rather, its participation is being compelled by the courts.

## VII.

The judgment of the Appellate Division is affirmed.  M&K is ordered to reimburse costs for, and reasonably related to, Hager's prescribed medical marijuana.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON'S opinion.